UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **SOUTHERN OHIO SAND COMPANY** ) | **CASE NO.1:19CV1686** |
| ) | |
| **Plaintiff,** ) | **JUDGE CHRISTOPHER A. BOYKO** |
| ) | |
| **Vs.** ) | |
| ) | |
| **PROFRAC SERVICES, LLC.** ) | **OPINION AND ORDER** |
| ) | |
| **Defendant.** ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on Defendant/Counterclaimant ProFrac Services, LLC.'s Motion for Judgment on the Pleadings. (ECF # 24). For the following reasons, the Court grants Defendant's Motion.

On July 23, 2019, Plaintiff Southern Ohio Sand Company, ("SOS"), an Ohio based company, filed its Complaint with the Court alleging Breach of Contract and Estoppel claims against Defendant ProFrac Services, LLC. ("ProFrac"), a Texas based company, for ProFrac's alleged failure to comply with the terms of a Letter Agreement for the purchase of hydraulic-fracturing sand.

On October 21, 2019, ProFrac filed its First Amended Counterclaim alleging Breach of Contract, Breach of Express and Implied Warranty and seeking Declaratory Judgment on the contracts between the parties. On February 11, 2020, ProFrac filed its Motion for Judgment on the Pleadings. The case is before the Court based on its diversity jurisdiction as SOS and ProFrac are residents of different states and the amount in controversy exceeds $75,000.

**SOS's Complaint**

According to SOS, it began selling fracking sand to ProFrac in February 2018 on an on-demand, as-available basis. In April of 2018, ProFrac obtained new Midwestern customers that required certain quantities of sand. Consequently, ProFrac approached SOS about an arrangement that would establish certain volume purchase commitments. In order to meet this volume commitment, SOS needed to expend approximately $2.5 million in capital improvements in order to enlarge its production capacity. Because of the capital outlay and because it would need to cease providing fracking sand to other customers in order to fulfill the demands of ProFrac, SOS alleges it required a take-or-pay provision wherein ProFrac would agree to minimum monthly quantities of sand or pay a minimum price for the monthly quantity, even if ProFrac declined delivery of it. ProFrac would be subject to the take-or-pay provision for the term of the agreement running from April 2018 through December 2020. The parties entered into the Letter Agreement on April 24, 2018, that contained the monthly volume commitment and the take-or-pay provision both of which would run for the term of the agreement.

In 2019, the demand for fracking sand slackened and supplies increased, resulting in ProFrac no longer needing SOS's fracking sand. On May 1, 2019, ProFrac sent a letter to SOS terminating the parties' agreements and purchase orders. SOS alleges ProFrac failed to pay open invoices prior to the effective date of the termination (30 days after notice) and failed to pay under the take-or-pay provision for the remainder of the term of the Letter Agreement, resulting in a breach of the Letter Agreement.

**ProFrac's Motion**

According to ProFrac, the plain language of the parties' agreements supports Declaratory

Judgment in ProFrac's favor. ProFrac contends the parties entered into two agreements, a Letter Agreement and a Master Purchase Agreement ("MPA") that was expressly incorporated into the Letter Agreement with the MPA expressly governing the parties' Purchase Orders, invoices, or other documents between the parties. According to ProFrac, the MPA affords each party the opportunity to terminate their relationship by giving thirty days notice. ProFrac complied with this requirement on May 1, 2019, therefore, it contends it is not liable to SOS for any sums owed after May 31, 2019.

According to ProFrac, it provides hydraulic-fracturing services. Hydraulic-fracturing sand is a necessary component of hydraulic fracturing. SOS manufactures and sells hydraulic fracturing sand. On February 28, 2018, SOS and ProFrac entered into the MPA that governed the purchase and sale of hydraulic-fracturing sand between SOS and ProFrac. The MPA contemplates further agreements between the parties concerning quantities, delivery and specifications but holds that the MPA will govern all Purchase Orders, invoices and other documents and expressly holds that no subsequent instrument will supersede or modify the MPA unless it is in writing.

In April of 2018, ProFrac and SOS entered into a Letter Agreement for quantities of 100 mesh fracking sand. The Letter Agreement incorporated the MPA, holding that the MPA shall govern General Terms of Sale.

After the parties entered into the Letter Agreement, ProFrac received shipments of fracking sand from SOS that ProFrac alleges failed to comport with the quality required under the parties' agreements, resulting in damage to ProFrac's pressure pumps. Thereafter, in May 2019 ProFrac terminated its agreements with SOS.

In July 2019, SOS filed suit, alleging ProFrac is obligated to pay under the Letter Agreement for sand it was required to purchase from SOS. ProFrac counterclaimed and now seeks Judgment on its Declaratory Judgment claim, a partial judgment on SOS's Breach of Contract claim and Judgment on SOS's Promissory Estoppel claim.

## LAW AND ANALYSIS

### Standard of Review

After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is governed by the same legal standard as a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted. *Almendares v. Palmer*, 284 F.Supp. 2d 799, 802 (N.D. Ohio 2003). Therefore, as with a motion to dismiss, the Court must test the sufficiency of the complaint and determine whether "accepting the allegations in the complaint as true and construing them liberally in favor of the plaintiff, the complaint fails to allege 'enough facts to state a claim for relief that is plausible on its face.'" *Ashmus v. Bay Vill. Sch. Dist. Bd. of Educ.*, 2007 U.S. Dist. LEXIS 62208 (N.D. Ohio 2007), *quoting Bell Atlantic Corp. v. Twombly*, U.S., 127 S.Ct. 1955, 1974 (2007). Claims alleged in the complaint must be "plausible," not merely "conceivable." *Id*. Dismissal is warranted if the complaint lacks an allegation as to a necessary element of the claim raised. *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485 (6th Cir. 1990). A Rule 12(c) motion "is granted when ***no material issue of fact*** exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991) (emphasis added). A written instrument attached to a pleading is a part of the pleading for all purposes. Fed. R. Civ. P.

10(c). "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.,* 508 F.3d 327, 335–36 (6th Cir. 2007).

**Declaratory Judgment**

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. Nevertheless, the Supreme Court has reiterated the discretionary nature of the Act. In *Public Affairs Press v. Rickover*, 369 U.S. 111, 82 S. Ct. 580, 7 L. Ed. 2d 604 (1962), the highest court opined: "'The Declaratory Judgment Act was an authorization, not a command. It gave the federal courts competence to make a declaration of rights; it did not impose a duty to do so.' *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494, 499 [62 S.Ct. 1173, 1177-78, 86 L.Ed. 1620 (1942)]." Put another way, the declaratory judgment statute "is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Green v. Mansour*, 474 U.S. 64, 72 (1985). The Sixth Circuit has held "where there is controversy as to the meaning and effect of a written contract interpretation may be sought from and made by the declaratory judgment of a court having jurisdiction over the parties, there is no doubt." *Panhandle E. Pipe Line Co. v. Michigan Consol. Gas Co.,* 177 F.2d 942, 944 (6th Cir. 1949). The Court finds that a dispute such as this, involving conflicts over contract interpretation are amenable in light of the above authority to declaratory judgment as the disputed issues represent an actual controversy between the parties.

ProFrac seeks a Judgment on the following: 1) Whether the MPA controls the parties'

purchases and sales of fracking sand before and after the Letter Agreement; 2) whether the MPA governs the termination rights of the parties, 3) whether SOS is entitled to sums allegedly owed after termination of the relationship and, 4) whether ProFrac is entitled to judgment on SOS's Estoppel claim.

**Does the MPA Control the Parties' Purchases and Sales of Frac Sand Before and After the Letter Agreement ?**

There is no dispute by the parties that they entered into both the MPA and the Letter Agreement and therefore, are bound by the terms therein. The MPA was signed by SOS and ProFrac on February 28, 2018. The preamble to the MPA reads:

> Whereas, Seller is willing to manufacture and/or supply the Products and/or provide the Services to Purchaser, and Purchaser is willing to purchase the same from Seller; and
>
> Now Therefore, for and in consideration of the mutual promises and agreements contained herein, and in any attachments or exhibits expressly incorporated herein, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby mutually agree that the following shall govern each such transaction between them:

(ECF #10-1).

The MPA reads, "This Agreement shall govern all Purchase Orders, invoices, or other documents between the Parties, and supercedes all other written or oral proposals or agreements." (ECF #10-1 ¶ 1). The MPA contains a choice of law provision naming Ohio law as the governing law. (*Id.* at ¶ 20). It also allows for termination for convenience with thirty days notice in writing. *(Id*. at ¶ 22-2(a)). The MPA expressly states it governs all purchase orders and prohibits modification by purchase order, or other statements, documents or instruments: provided that any terms in a purchase order regarding price, quantity, delivery, or

specifications of the products or services will be enforceable. However, it expressly reads that in the event of any conflict between the MPA and a subsequent purchase order, the MPA controls. (*Id* at ¶ 22-3). Modification may only be made by a writing signed by both parties. (*Id* at ¶ 22-4.)

The Letter Agreement was signed April 24, 2018, and was intended to set forth the terms and conditions governing the sale of sand from SOS to ProFrac. It establishes the price of sand, the type of sand and establishes that orders of sand will be made by purchase orders. The Letter Agreement reads that the terms of the agreement become effective April 2018 and continue until December 31, 2020, at which time the Buyer (ProFrac) has the right to renew for an additional year provided ProFrac sends notice of renewal to SOS by December 15, 2020.

At issue is Section 7 of the Letter Agreement captioned "Volume Commitment," wherein ProFrac agreed to purchase and SOS agreed to sell a minimum of 12,000 tons of sand per calendar month for the life of the contract. The Letter Agreement expressly reads that the MPA shall govern General Terms of Sale. (ECF #10-2 ¶ 4). This quantity was increased via an amendment. (ECF# 10-4).

According to ProFrac, nothing in the Letter Agreement modifies or alters the MPA's termination for convenience provision, which allows for termination of the MPA with only thirty days advance written notice. It also reads that termination of a purchase order may be made upon written notice. There appears no advance time frame required by the MPA for termination of a purchase order. ProFrac gave thirty days notice on May 1, 2019, that it was terminating effective May 31, 2019, "any and all purchase orders and agreements between the parties, including the letter agreement..." (ECF # 10-5).

According to ProFrac, the MPA governs ***all*** purchase orders, the Letter Agreement expressly incorporates the MPA by reference and the MPA expressly states it supercedes all other written agreements, therefore, its terms control. The MPA further reads that if there are any conflicts between subsequent purchase orders and the MPA, the MPA controls. Thus, ProFrac argues it is entitled to a Declaratory Judgment on its Counterclaim that the MPA controls all transactions between SOS and ProFrac before and after the Letter Agreement. Consequently, ProFrac seeks a Declaratory Judgment on Count One of its Counterclaim that

> the MPA governed the sale and purchase of hydraulic-fracturing sand between the parties; that Exhibit A to the Letter Agreement is null; and that ProFrac properly terminated all purchase orders and agreements between it and SOS in accordance with the terms of the MPA.

(ECF # 10 ¶ 33).

According to SOS, there are several interpretations of the Letter Agreement when read in conjunction with Exhibit A to the Letter Agreement and the MPA, creating ambiguities that militate against judgment in the absence of discovery. For example, Section 4 of the Letter Agreement reads that the MPA, executed 2/26/18, shall govern. However, Section 1 of Ex. A to the Letter Agreement appears to limit such application to "terms contained herein that are additional to or different from those in the letter agreement will be interpreted in accordance with Section 4 of the letter agreement." (ECF #10-2 § 1). Furthermore, SOS asserts that the Letter Agreement only incorporated the MPA insofar as it applies to certain "General Terms of Sale" and nothing more, and does not define "General Terms of Sale." Moreover, the MPA controls over any conflicting terms in subsequent agreements between the parties but would not incorporate MPA terms that were set out in, but not in conflict with, terms in Ex. A. Lastly, the

contracts could be read to render Ex. A terms superfluous if the Court reads the Letter Agreement as incorporating the MPA in its entirety.

There is no dispute that Ohio law governs the claims in this action. Under Ohio law, "the elements for a breach of contract are that a plaintiff must demonstrate by a preponderance of the evidence that (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Anzalaco v. Graber,* 970 N.E.2d 1143, 1148 (Ohio Ct.App.2012). When interpreting a contract, the Court's purpose "is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (Ohio 1997). The general presumption under Ohio law is that the parties' intent resides within the four corners of the contract to be construed. *Id.* "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* (internal quotations omitted).

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.,* 524 F.3d 754, 763 (6th Cir.2008) (applying Ohio law). "[I]n cases where ambiguity exists, interpretation of the parties' intent is a question to be determined by the trier of fact." *Schafer v. Soderberg & Schafer,* 196 Ohio App.3d 458, 477, 964 N.E.2d 24 (Ohio Ct.App.2011) (internal quotations omitted); see also *PNC Bank, N.A. v. May,* No. 98071, 2012 WL 4243807, at *2 (Ohio Ct.App. Sept. 20, 2012) ("If ... the contract is ambiguous, ascertaining the parties' intent constitutes a question of fact that may require the consideration of parol

evidence.").

"Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 414, 784 N.E.2d 186 (Ohio Ct.App.2003) (internal quotations omitted). "[W]here a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent." *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 219, 797 N.E.2d 1256 (Ohio 2003) see also *Mulch Mfg., Inc. v. Advanced Polymer Sols.,* LLC, 947 F. Supp. 2d 841, 857–58 (S.D. Ohio 2013).

Here, the Court finds no ambiguity exists based on a plain reading of the MPA and Letter Agreement. First, the Court finds there is no ambiguity regarding the identification of the MPA incorporated into Section 4 of the Letter Agreement. SOS argues it is unclear what MPA is referred to in Section 4 of the Letter Agreement because Section 4 describes the MPA "executed 2/26/18 but the MPA, signed by both parties, was executed 2/28/18. However, this is an obvious typographic error as there is no dispute there was only one MPA signed by both parties and does not create an ambiguity.

Second, any ambiguity caused by conflicting readings of the MPA, the Letter Agreement and Ex. A to the Letter Agreement are immaterial because a plain reading of the Letter Agreement signed by both parties contains no reference to, or incorporation of, Ex. A. SOS relies heavily on the terms contained in Ex. A in support of its ambiguity arguments, but such reliance is misplaced. Ex. A. has no relevance to the Court's interpretation of the parties' agreements because a plain reading of the Letter Agreement signed by both parties contains no reference to Ex. A. Thus, its terms will not be considered by the Court.

This leaves the Court with the task of interpreting the interplay between the Letter Agreement and the MPA in deciding the relevant agreements between the parties.  It is important to recognize that the very term "***Master*** Purchase Agreement" denotes its intended control over other purchase agreements of the parties.   This designation as the Master Purchase Agreement is supported by the terms of the MPA, including such representations that: it will govern "each such transaction between them," that it governs "all purchase orders, invoices, or other documents between the parties" and in the case of any conflict between the MPA and a purchase order, the MPA "shall prevail" and "supercedes" the same.  The Letter Agreement contains no such overarching terminology.

SOS argues the Letter Agreement's incorporation of the MPA was limited to "General Terms of Sale" and that term is ambiguous.   SOS argues that any reading of the Letter Agreement that would incorporate the "termination for convenience" provision of the MPA would frustrate the entire purpose of the Letter Agreement which was intended to mitigate SOS's risk in its capital expenditures to increase production of sand and further protect it as ProFrac was its sole customer.  However, the Letter Agreement's stated purpose is found in its opening sentence, "the purpose of the letter is to set forth the terms and conditions governing the sale of sand for fracturing by Southern Ohio Sand Co. ("Seller") to ProFrac ("Buyer" or "Customer"). Consequently, the Court finds the plain language of the Letter Agreement provides a clear, unambiguous statement of its purpose that does not support SOS's contention.

"In Ohio, under general principles of contract law, separate agreements may be incorporated by reference into a signed contract. When a document is incorporated into another by reference, both instruments must be read and construed together."  *KeyBank Natl. Assn. v. Sw.*

*Greens of Ohio, L.L.C.,* 2013-Ohio-1243, ¶ 21, 988 N.E.2d 32, 39. There is no dispute that the Letter Agreement incorporates the MPA in Section 4. In interpreting "General Terms of Sale," ProFrac argues the Court should apply the dictionary definition of "general," which is defined as "involving, applicable to, or affecting the whole." *Https://merriam-webster.com/dictionary/general.* "To ascertain the common meanings of terms or phrases not defined in the language of contracts, Ohio courts routinely turn to dictionaries." *Textileather Corp. v. GenCorp Inc.,* 697 F.3d 378, 382 (6th Cir. 2012). This definition, when read in conjunction with the MPA, which reads that the MPA will govern all transactions between the parties for the sale of sand, leaves no ambiguity that the MPA terms govern. This is further evidenced by the language, agreed to by the parties in the MPA, that any conflicts regarding purchase orders will be governed by the MPA. This is further supported by the MPA language which clearly contemplated additional agreements regarding purchase orders, yet reeserves the ultimate authority over the parties' transactions in the MPA. The MPA expressly states it governs all purchase orders and prohibits modification by purchase order, or other statements, documents or instruments and it expressly reads that in the event of any conflict between the MPA and subsequent purchase orders, the MPA controls. (10-1 at ¶ 22-3). Nothing in the Letter Agreement modifies the controlling authority of the MPA, including the rights of termination for convenience or cancellation of purchase orders. Therefore, the Court declares that the MPA governs the transactions of the parties both before and after the Letter Agreement as stated above.

**The Termination for Convenience Provision**

Because the MPA ultimately governs all transactions between the parties, the Court

further declares that the MPA's termination provision applies and ProFrac's termination complied with, and was not in breach of, the Letter Agreement. The Letter Agreement is silent on termination and incorporates the MPA's General Terms of Sale. Nothing in the Letter Agreement, nor the MPA, prohibits ProFrac from terminating any agreement or purchase order for convenience. Because the volume commitment and purchase orders regarding the same in the Letter Agreement are transactions for sale between the parties, the MPA, incorporated into the Letter Agreement, governs all such transactions and the termination for convenience was expressly agreed to by the parties. Furthermore, the MPA expressly holds it remains in effect until terminated by either party. (ECF # 10-1. § 22-2(a)). It further reads that, "except as the Parties may otherwise agree, upon such termination by Purchaser, Seller shall stop performance under the terminated Purchase Order (to the extent specified in the notice of termination). Purchaser shall pay Seller to the extent of Seller's proper performance under the terminated Purchase Order." There is no dispute that the parties did not otherwise agree on a termination condition different from that set out in the MPA. Therefore, the Court declares that ProFrac's termination complied with the agreements of the parties.

SOS argues that ProFrac's bad faith in negotiating militates in favor of denying its Motion. However, the Court finds SOS's Complaint does not allege bad faith in negotiation of the Letter Agreement. SOS only raises this argument in its Opposition brief, but any such argument is belied by the allegations in the Complaint that ProFrac paid under the terms of the Letter Agreement for the first quarter of 2019 but then, due to the decreased demand for fracking sand, terminated the agreements. SOS's Complaint asserts no claim of bad faith in the negotiation of the Letter Agreement that would warrant denial of ProFrac's Motion.

13

**Promissory Estoppel**

SOS alleges a Promissory Estoppel claim against ProFrac, alleging ProFrac promised to maintain a business relationship and buy sand from SOS for a specific term and SOS relied on these representations to its detriment.  ProFrac seeks judgment on SOS's Promissory Estoppel claim, contending the parties' agreements on sand purchases and the duration of their relationship are contained in the parties written contracts.  "Ohio law does not recognize a claim for promissory estoppel that contradicts the express terms" of a valid contract. *Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 377 (6th Cir.1999).  "Promissory estoppel is an equitable remedy that only comes into play when the requisites of a contract are not met, yet the promise should be enforced to avoid injustice." *Padula v. Wagner*, 2015-Ohio-2374, ¶ 43, 37 N.E.3d 799, 812.   Because the Court has determined, and the parties agree, that they have valid, enforceable and binding contracts that govern their relationship,  ProFrac is entitled to judgment on SOS's Promissory Estoppel claim.

**Partial Judgment on SOS's Breach of Contract Claim**

The termination clause in the MPA expressly reads, "Except as the Parties may otherwise agree, upon such termination by Purchaser, Seller shall stop performance under the terminated Purchase Order (to the extent specified in the notice of termination).  Purchaser shall pay Seller to the extent of Seller's proper performance under the terminated Purchase Order."  (ECF # 10-1, § 22-2(a)).   Because the termination was proper and ProFrac's termination letter terminated "any and all purchase orders and agreements," SOS is not entitled to recover any sums for contracted-for sales of fracking sand to ProFrac after May 31, 2019, the effective date of the termination.

14

Therefore, for the foregoing reasons, the Court declares: the MPA governed the transactions of the parties before and after the Letter Agreement; that Ex. A is not part of the agreements between the parties; that under the authority of the MPA and in the absence of modification under the Letter Agreement, ProFrac's termination was within its contractual rights and it does not owe SOS on any contracted-for purchase order or agreement for sale of fracking sand after the effective date of the termination, and grants Judgment for ProFrac on SOS's Promissory Estoppel claim.

IT IS SO ORDERED.

 /s/Christopher A. Boyko
CHRISTOPHER A. BOYKO
Senior United States District Judge